**The COMPUTER SHOPPE, INC.,**
**Plaintiff/Appellant,**

v.

**STATE of Tennessee,**
**Defendant/Appellee.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 2, 1989.

Permission to Appeal Denied by
Supreme Court Nov. 27, 1989.

E. Clifton Knowles, Bass, Berry & Sims, Nashville, for plaintiff/appellant.

Charles W. Burson, Atty. Gen. and Reporter, Tara A. O'Brien, Asst. Atty. Gen., for defendant/appellee.

## OPINION

KOCH, Judge.

This appeal concerns the Tennessee Claims Commission's jurisdiction to consider a complaint filed by an unsuccessful bidder after the Commissioner of General Services rejected all the bids for a state-wide microcomputer system. The bidder sought to recover its costs for software modifications made at the State's request during the procurement process. The Commission found that it lacked subject matter jurisdiction and dismissed the complaint. We have determined that the complaint states a claim upon which relief can be granted and, therefore, reverse the Commission's decision.

### I.

The Department of Correction received a criminal justice block grant from the United States Department of Justice in 1986 to help Tennessee's sheriffs set up a statewide microcomputer system. The purpose of the system was to automate the sheriffs' local operations and to provide them with a communications link to the Tennessee Bureau of Investigation's criminal information system.

In July, 1986 and again in May, 1987, the executive director of the Tennessee Sheriffs' Association, Inc. ("TSA")[1] requested the Department of General Services to procure the system in accordance with Tenn. Code Ann. § 12–3–1001 (1987).[2] The department agreed to assist the TSA and, bypassing the state agencies normally involved in procuring computer equipment, assembled a committee to assist in drafting the specifications and evaluating the bids.[3] The specifications proved to be seriously deficient. Many key specifications were ambiguous; others were missing. In addition, the testing procedures were imprecise and failed to reflect the system's actual requirements.

On July 1, 1987, the Department of General Services issued an invitation to bid ("ITB") for a two-year, $2 million contract to purchase the microcomputers, peripherals, and software, including the Bell Sys-

1. The TSA is a nonprofit, nongovernmental entity formed by Tennessee's sheriffs to promote common goals and programs. Apparently the sheriffs were looking to the TSA to coordinate their participation in the procurement of the microcomputer system.

2. Tenn.Code Ann. § 12–3–1001(a) empowers the Department of General Services to purchase equipment "for any county, city, municipality, special district, school district, or other local governmental unit of the state."

3. The five-member committee included employees of the Department of General Services and the TBI, the TSA's executive director, an employee of the University of Tennessee's County Technical Assistance Service ("CTAS"), and an independent software provider. The CTAS employee prepared the hardware specifications, and the TBI employee prepared the specifications and testing procedures for communications software.

tem's 8A1 communications protocol,[4] needed for the system. Eleven bidders responded to the ITB. The department opened the bids on August 4, 1987, and eventually disqualified the two lowest bidders because they could not provide the Bell System 8A1 communications protocol. On August 17, 1987, it requested the third lowest bidder, The Computer Shoppe, Inc. ("Computer Shoppe"), to set up its system at the TBI's headquarters for demonstration and testing.

Several performance problems appeared during the initial demonstration of the Computer Shoppe's system. The department agreed to extend the testing period, and the Computer Shoppe agreed to make the needed corrections as well as other minor software modifications not required by the specifications. Additional tests revealed other minor problems which the Computer Shoppe also agreed to correct. In order to give the Computer Shoppe the opportunity to modify its software, the department again extended the test period.

According to the Computer Shoppe's manager, the TBI and the Department of General Services' representatives and the TSA's executive director informed the company on September 3, 1987, that only one problem remained and promised to award the contract to the Computer Shoppe if it would agree to modify its software by September 4, 1987 to provide on-screen verification of the receipt of inquiries. The Computer Shoppe agreed to make the necessary software modifications, even though it believed that the specifications did not clearly require them, and flew in its hardware and communications experts to do the work.

The TBI employee responsible for testing the system gave his preliminary approval to the modifications on September 4, 1987. However, he later informed the TSA and the Department of General Services on September 8, 1987, that the Computer Shoppe's communications software did not comply with the specifications in three areas. Accordingly on September 9, 1987, the TSA requested the Department of General Services to reject the Computer Shoppe's bid and to proceed to the next bidder.

The Computer Shoppe discovered during a September 11, 1987 conference call that its system had not passed the TBI's tests. After obtaining the test results, it filed a formal protest with the Commissioner of General Services on September 16, 1987, detailing its efforts to satisfy the TBI's demands and pointing out the inadequacies and contradictions in the specifications.

The Commissioner met with the Computer Shoppe's representatives and on September 18, 1987, extended the procurement process until September 25, 1987, to give the Computer Shoppe time to "complete the adjustments allowed by the I.T.B." He also invited the Computer Shoppe to seek whatever other "clarifications" to the specifications it required.

The TBI conducted benchmark tests of the Computer Shoppe's system on September 25, 1987. On September 28, 1987, it notified the Department of General Services and the TSA that the system had complied with all tests except one which had not been included in the specifications and which had never been discussed with the bidders.

During the latter stages of the testing, an employee of the General Assembly's Fiscal Review Committee requested the Attorney General to review the ITB and the procurement process being used to acquire the sheriffs' computer system. During a September 30, 1987 meeting, a deputy attorney general informed the TSA's executive director and officials on the Department of General Services that the ITB was so seriously flawed that any contract based upon it would be void.

Following this meeting, the Commissioner of General Services decided to exercise his statutory prerogative to cancel all the bids on the pretext that the ITB had failed to include a provision relating to installa-

---

**4.** The Bell System 8A1 protocol was necessary to enable the sheriffs' system to communicate with the TBI.

tion and training. On October 5, 1987, the Department of General Services, without explanation, notified the Computer Shoppe that it had rejected all the bids and had cancelled the ITB.

The Computer Shoppe filed another protest with the Commissioner of General Services on October 13, 1987. Two days later, the Commissioner declined to consider the protest and referred the Computer Shoppe to the Tennessee Claims Commission. On October 30, 1987, the Computer Shoppe requested a hearing before the Board of Standards.[5] The Board discussed the Computer Shoppe's request and on November 20, 1987, declined to hear the protest due to the Computer Shoppe's "failure to state a claim upon which the Board could grant relief." [6]

The Computer Shoppe then filed a claim for damages with the Division of Claims Administration. The division transferred the claim to the Tennessee Claims Commission ("Commission") on May 2, 1988, and on June 1, 1988, the Computer Shoppe filed a complaint with the Commission seeking to recover its costs to modify its software and communications protocols in response to the assurances that it would be awarded the contract if the modifications were made. The Commission ultimately determined that it did not have subject matter jurisdiction to consider the complaint because the Commissioner of General Services had rejected all the bids before a contract to purchase the Computer Shoppe's system came into existence.

While the Computer Shoppe was pursuing its administrative remedies within the state system, the TSA started the procurement process anew through Montgomery County's purchasing system. The TSA eventually acquired the sheriffs' computer system from another vendor who had also submitted a bid in response to the State's ITB.

## II.

■ We turn first to the Computer Shoppe's contention that the Division of Claims Administration's processing of the claim somehow conferred subject matter jurisdiction on the Tennessee Claims Commission. While the state officials who reviewed the matter led the Computer Shoppe to believe that the Commission could consider its claim, they cannot confer subject matter jurisdiction on the Commission if it does not exist by statute.

The Computer Shoppe pursued every administrative remedy available to disgruntled bidders before it filed its claim with the Commission. It filed a protest with the Commissioner of General Services pursuant to Tenn.Code Ann. § 12–3–214(a) (1987);[7] it requested a hearing before the Board of Standards pursuant to Tenn.Code Ann. § 12–3–214(b)(2); and it filed a claim for damages with the Division of Claims Administration pursuant to Tenn.Code Ann. § 9–8–402(a) (1987).

In each instance, the state officials or agencies declined to take action and referred the Computer Shoppe elsewhere. On October 15, 1987, the Commissioner of General Services suggested that the Computer Shoppe should take its claim to the Tennessee Claims Commission. On November 6, 1987, the Board of Standards declined to hear the matter, stating that the Computer Shoppe had "other remedies." On May 2, 1988, the Division of Claims Administration transferred the case to the Commission because it had been unable to act on the claim within ninety days.

5. The Board of Standards is a three-member board responsible for overseeing the State's purchasing policies and procedures. Tenn.Code Ann. § 12–3–214(b)(2) (Supp.1988) authorizes the Board to consider protests filed by "any actual bidder ... who claims to be aggrieved in connection with a bid, bid process or a pending award of a contract."

6. The Board also requested the Comptroller to review the attempted procurement of the sher-

iffs' microcomputer system and to make a report of its findings. The report filed with the Board on January 7, 1988 labelled the ITB and the procurement process a "disaster."

7. The 1988 amendments to the protest procedures contained in Act of March 24, 1988, ch. 641, 1988 Tenn.Pub.Acts 302 did not become effective until March 30, 1988 and, therefore, were inapplicable to the Computer Shoppe's protest.

We can readily see how the actions of the Commissioner of General Services, the Board of Standards, and the Division of Claims Administration would create the expectation in any reasonable claimant's mind that the Commission could hear and act on its claim. However, only the Tennessee Constitution or the Legislature can confer subject matter jurisdiction. *Turpin v. Conner Bros. Excavating Co.*, 761 S.W.2d 296, 297 (Tenn.1988); *Kane v. Kane*, 547 S.W.2d 559, 560 (Tenn.1977). It cannot be conferred by the parties' conduct. *Shelby County v. City of Memphis*, 211 Tenn. 410, 413, 365 S.W.2d 291, 292 (1963); *Seagram Distillers Co. v. Jones*, 548 S.W.2d 667, 671 (Tenn.Ct.App.1976).

Accordingly, we find that the bureaucratic shuffling of the Computer Shoppe's claim did not confer subject matter jurisdiction on the Commission and does not estop the State from raising the issue now. Subject matter jurisdiction involves a tribunal's inherent power to hear and decide a particular controversy, *Standard Sur. & Casualty Co. v. Sloan*, 180 Tenn. 220, 230, 173 S.W.2d 436, 440 (1943); *Swift & Co. v. Memphis Cold Storage Warehouse Co.*, 128 Tenn. 82, 100, 158 S.W. 480, 485 (1913), and can be questioned at any stage of the proceeding. *See* 2 Tenn.Admin.Comp. ch. 0310-1-1-.12(8)(b); *C.F. Rule Constr. Co. v. Cumberland River Sand Co.*, 204 Tenn. 378, 380–81, 321 S.W.2d 791, 792 (1959); *Gillespie v. State*, 619 S.W.2d 128, 129 (Tenn.Ct.App.1981).

### III.

The Computer Shoppe takes issue with the Commission's dismissal of its complaint for failure to state a claim upon which relief could be granted. It insists that it has made out a claim within the Commission's jurisdiction and that the Commission should have reached the merits of the case. We agree.

### A.

█ The State's motion to dismiss is predicated on 2 Tenn.Admin.Comp. ch. 0310-1-1-.12, the Commission's rule analogous to Tenn.R.Civ.P. 12. Like motions made pursuant to Tenn.R.Civ.P. 12, motions to dismiss filed with the Commission test the sufficiency of the complaint. *See Merriman v. Smith*, 599 S.W.2d 548, 560 (Tenn.Ct.App.1979). They admit the truth of all relevant and material averments in the complaint but insist that the alleged facts do not constitute a cause of action. *Gordon v. City of Henderson*, 766 S.W.2d 784, 787 (Tenn.1989); *Shipley v. Knoxville Journal Corp.*, 670 S.W.2d 222, 223 (Tenn. Ct.App.1984).

The courts construe complaints being challenged by a Tenn.R.Civ.P. 12.02(6) motion liberally in favor of the pleader. *Holloway v. Putnam County*, 534 S.W.2d 292, 296 (Tenn.1976). They should not dismiss a complaint unless it appears beyond a reasonable doubt that the plaintiff can show no set of facts in support of its claim that will entitle it to relief. *Pemberton v. American Distilled Spirits Co.*, 664 S.W.2d 690, 691 (Tenn.1984); *Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d 788, 790 (Tenn.1978); *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 759–60 (Tenn.1977).

### B.

The Commission found the Computer Shoppe's contract theory wanting because the Commissioner of General Services cancelled the procurement before signing a written contract. The Computer Shoppe insists, however, that its claim is not based upon a written contract but rather upon an express oral contract in which the State promised to award the contract to the Computer Shoppe if it would modify its communications software. Thus, we are called upon to decide whether the Commission has jurisdiction over a claim based on oral contract. The answer is in the Commission's enabling legislation.

When the Computer Shoppe filed its complaint, the Commission's authority to adjudicate contract claims was found in Tenn. Code Ann. § 9–8–307(a)(1)(L) (Supp.1988) which authorized claims "founded upon any express contract or breach thereof." The State argued, and the Commission apparently agreed, that contracts must be in writing in order to be express contracts.

We do not believe that the General Assembly intended Tenn.Code Ann. § 9-8-307(a)(1)(L) to be construed so narrowly.

■ Our role in construing statutes is to ascertain and to give effect to the General Assembly's intentions. *Westinghouse Elec. Corp. v. King*, 678 S.W.2d 19, 23 (Tenn.1984), *cert. denied*, 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985); *Brooks v. Fisher*, 705 S.W.2d 135, 137 (Tenn.Ct.App.1985). We do so by considering the statute as a whole in light of its general purpose, *Tennessee Growers, Inc. v. King*, 682 S.W.2d 203, 205 (Tenn.1984); *City of Lenoir City v. State ex rel. City of Loudon*, 571 S.W.2d 297, 299 (Tenn.1978), and by giving the statute's words their ordinary, commonly accepted meaning. *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985); *Mercy v. Olsen*, 672 S.W.2d 196, 198 (Tenn.1984); *Weaver v. Woods*, 594 S.W.2d 693, 695 (Tenn.1980).

■ In common legal parlance, contracts are "express" when their terms are stated in words at the time the agreement is made. *Thompson v. Woodruff & Co.*, 47 Tenn. (7 Cold.) 401, 409 (1870); *see also* 1 S. Williston, *A Treatise on the Law of Contracts* § 3 (3d ed.1957); 17 Am.Jur.2d *Contracts* § 3 (1964); 17 C.J.S. *Contracts* § 3 (1963).

■ Most courts recognize that express contracts may be either oral or written. *People's Bank & Trust Co. v. United States*, 11 Cl.Ct. 554, 566 (1987); *Thomas v. Lomax*, 82 Ga.App. 592, 61 S.E.2d 790, 791 (1950); *Century 21 Castles By King, Ltd. v. First Nat'l Bank of Western Springs*, 170 Ill.App.3d 544, 121 Ill.Dec. 174, 177, 524 N.E.2d 1222, 1225 (1988); *Woodall v. Citizens Banking Co.*, 507 N.E.2d 999, 1001 (Ind.Ct.App.1987); *J. Koury Steel Erectors, Inc. v. San-Vel Concrete Corp.*,

120 R.I. 360, 387 A.2d 694, 697 (1978); *see also* 1 A. Corbin, Corbin on Contracts § 18 (1963).

Aside from dicta in *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn.1980), Tennessee's courts have recognized and followed the general rule. Over seventy-five years ago, the Tennessee Supreme Court stated that

> A contract is created by act of the parties. It may be either express or implied. It may be written or oral. It must result from a meeting of the minds of the parties in mutual assent to its terms. It must be founded on a sufficient consideration. It must be mutual, free from fraud or undue influence, not against public policy, and sufficiently definite.

*American Lead Pencil Co. v. Nashville, C. & St. L. Ry.*, 124 Tenn. 57, 64, 134 S.W. 613, 615 (1911); *see also Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (1962).

Accordingly, in both reported and unreported opinions, this Court has repeatedly recognized the existence of oral express contracts. *Southern Ry. v. Mullins*, 751 S.W.2d 152, 153 (Tenn.Ct.App.1988); *Cotton v. Roberts' Estate*, 47 Tenn.App. 277, 282-83, 337 S.W.2d 776, 779 (1960).[8] Our decision in *Greenhill v. Carpenter*, 718 S.W.2d 268, 272-73 (Tenn.Ct.App.1986) does not reach a contrary result because the plaintiff in that case based her claim on an implied contract rather than an oral or written express contract.[9]

■ We have not been provided, and indeed cannot discern, any reason to conclude that the General Assembly intended to depart from the ordinary meaning of "express contract." In fact, a review of the General Assembly's waiver of the State's sovereign immunity demonstrates the contrary.[10]

---

8. *See also House v. Tenn. Mark Telecommunications, Inc.*, App. No. 87-256-11, slip op. at 6, 1988 WL 123014 (Tenn.Ct.App. Nov. 18, 1988).

9. Implied contracts, unlike oral express contracts, do not require the parties' express assent concerning their terms. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 53-54, 407 S.W.2d 150, 153-54 (1966).

10. The Tennessee Supreme Court has specifically approved using a statute's legislative history as a statutory construction tool. *Chapman v. Sullivan County*, 608 S.W.2d 580, 582 (Tenn. 1980); *Watts v. Putnam County*, 525 S.W.2d 488, 492 n. 4 (Tenn.1975); *Southern Ry. v. Fowler*, 497 S.W.2d 891, 895 (Tenn.1973).

When the General Assembly first waived the State's sovereign immunity in 1977, it permitted actions based on "express or implied contract or breach thereof." *See* Act of May 4, 1977, ch. 281 § 1, 1977 Tenn.Pub. Acts 652, 653, codified at Tenn.Code Ann. § 29–10–101 through 29–10–103 (1980). The General Assembly narrowed the scope of the waiver in 1980 by eliminating causes of action based on implied contracts. *See* Act of March 27, 1980, ch. 754 § 1, 1980 Tenn.Pub.Acts 796.

In 1982, the General Assembly created a special committee to study the manner in which claims against the State and its employees were being processed. *See* Act of April 6, 1982, Senate Joint Resolution 216, 1982 Tenn.Pub.Acts 865. The study committee's report, filed on February 29, 1984, recommended that the State continue to waive its sovereign immunity in contract. *See Report of the Study Committee Created by Senate Joint Resolution 216 of the 92nd General Assembly*, at p. 18 (Feb. 20, 1984). It also recommended legislation to provide for the administrative processing of claims against the State. Section 8(a)(11) of the proposed bill permitted claims against the State for "[a]cts constituting a breach of contract."

The General Assembly enacted the legislation. However, in the process, it replaced the study committee's proposed breach of contract provision with language similar to Tenn.Code Ann. § 29–10–101(a)(1).[11] The Act, as now codified at Tenn.Code Ann. § 9–8–301 through 9–8–307 (1987 & Supp. 1988), provides the statutory basis for the Tennessee Claims Commission's jurisdiction. Thus, in 1987, Tenn.Code Ann. § 9–8–307(a)(1)(L) permitted claims against

the State arising out of "[a]ctions founded on any express contract or breach thereof."

In 1989, the Attorney General asked the General Assembly to limit the scope of Tenn.Code Ann. § 9–8–307(a)(1)(L) to "[a]ctions for breach of a written contract between the claimant and the state." During the Senate's debate, the bill's sponsor explained that the Attorney General had requested the Legislation because the Commission had been construing Tenn.Code Ann. § 9–8–307(a)(1)(L) to be broad enough to cover oral contracts as well as written contracts.[12] The General Assembly enacted the bill and, commencing on June 1, 1989, claims pursuant to Tenn.Code Ann. § 9–8–307(a)(1)(L) can be based only on written contracts. *See* Act of May 24, 1989, ch. 491 § 2, 1989 Tenn.Pub.Acts ——.

The 1989 legislation is not retroactive. Prior to 1989, Tenn.Code Ann. § 9–8–307(a)(1)(L) permitted claims against the State based on express contracts, not just written ones. Thus, the Commission's dismissal of the Computer Shoppe's complaint cannot stand. In light of the consistent judicial and administrative construction of "express contract," the term's natural and ordinary meaning includes not only written contracts but oral contracts as well.

### C.

The Computer Shoppe also contends that it has stated a cause of action under Tenn. Code Ann. § 9–8–307(a)(1)(N) (Supp.1988) which authorizes claims based on the "[n]egligent deprivation of statutory or constitutional rights."[13] It insists that it should have been awarded the contract and that it has incurred damages as a "direct result of the State's negligence in allowing

---

11. *See* Act of May 24, 1984, ch. 972 § 8(a)(12), 1984 Tenn.Pub.Acts 1026, 1030, now codified at Tenn.Code Ann. § 9–8–307(a)(1)(L) (Supp.1988). The General Assembly also repealed Tenn.Code Ann. § 29–10–101 through 29–10–103. *See* Act of May 24, 1984, ch. 972 § 19(b), 1984 Tenn. Pub.Acts 1026, 1035.

12. While the courts are not bound by an agency's interpretation of a statute, *State ex rel. Chapdelaine v. Torrence*, 532 S.W.2d 542, 547 (Tenn.1975), *cert. denied*, 425 U.S. 953, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1977), the agency's construction is entitled to consideration and re-

spect. *Nashville Mobilphone Co. v. Atkins*, 536 S.W.2d 335, 340 (Tenn.1976).

13. In 1989, the General Assembly limited claims under Tenn.Code Ann. § 9–8–307(a)(1)(N) to those based on the "negligent deprivation of statutory rights." *See* Act of May 24, 1989, ch. 491 § 1, 1989 Tenn.Pub.Acts ——. Like the recent modification of Tenn.Code Ann. § 9–8–307(a)(1)(L), this limitation is prospective only and does not affect the Computer Shoppe's claim in this case.

the ITB to be issued in the first instance." We disagree. While the competitive bidding statutes require the State to give fair consideration to all bids submitted, they do not require the State to award a contract when the invitation to bid is defective.

■ The objectives of public bidding statutes are the same no matter whether the State or a local government is soliciting the bids. *Bradford & Bigelow v. Commonwealth*, 24 Mass.App.Ct. 349, 509 N.E.2d 30, 36 (1987). The statutes are intended to promote the public interest by (1) aiding governments in procuring the best work or materials for the lowest practical price;[14] (2) providing bidders with a fair forum for competing for government contracts;[15] and (3) protecting the public from its officials' self-dealing, extravagance, and favoritism.[16]

In order to provide bidders with a fair forum, competitive bidding statutes implicitly recognize that the public contracting authorities must fairly and honestly consider all bids in accordance with the applicable statutes. *Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084, 1095 (6th Cir.1981); *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 393 (1984); *King v. Alaska State Hous. Auth.*, 633 P.2d 256, 261 (Alaska 1981); *Paul Sardella Constr. Co. v. Braintree Hous. Auth.*, 3 Mass. App.Ct. 326, 329 N.E.2d 762, 766 (1975); *Superior Hydraulic, Inc. v. Town Bd. of Islip*, 88 A.D.2d 404, 453 N.Y.S.2d 711, 714 (1982).

Permitting public contracting authorities to give bids less than full and fair consideration will undermine the purposes of competitive bidding by discouraging the number of bidders and by destroying public confidence in the integrity of the process.

*Bradford & Bigelow, Inc. v. Commonwealth*, 509 N.E.2d at 36. If a bidder invests the time and resources in seeking the government's business by preparing and submitting a bid, it is not too much to impose on the government the correlative obligation of fair dealing within the terms of the solicitation. *Merriam v. Kunzig*, 476 F.2d 1233, 1242 n. 7 (3d Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *King v. Alaska State Hous. Auth.*, 633 P.2d at 263.

■ Bidders, however, do not necessarily have a vested or contractual right to be awarded a state contract, *see Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084, 1094 (6th Cir.1981); *Network Technical Servs., Inc. v. D.C. Data Co.*, 464 A.2d 133, 135 (D.C.App.1983); *Haughton Elevator Div. v. State, Through Div. of Administration*, 367 So.2d 1161, 1165 n. 3 (La. 1979), because Tenn.Code Ann. 12–3–203(i) (1987) permits the Commissioner of General Services to reject all bids and to cancel a solicitation without awarding a contract.

■ Rejecting all bids and cancelling a solicitation discourages competitive bidding and should be the exception in government procurement rather than the rule. *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 395 (1984). The government must have just cause to cancel a solicitation, and persons challenging a decision to cancel a solicitation will succeed if they demonstrate that the soliciting agency had no reasonable or rational basis for its decision. *Aviation Enters., Inc. v. United States*, 8 Cl.Ct. 1, 15 (1985).

■ Tenn.Code Ann. § 12–3–203(i) defines the circumstances that warrant cancelling a solicitation without awarding a contract.[17] Tenn.Code Ann.

---

14. *See Anderson v. Peterson*, 221 Neb. 149, 375 N.W.2d 901, 904 (1985); *Interstate Eng'g Corp. v. City of Fitchburg*, 367 Mass. 751, 329 N.E.2d 128, 131 (1975); *Equitable Shipyards, Inc. v. State ex rel. Dept. of Trans.*, 93 Wash.2d 465, 611 P.2d 396, 401 (1980).

15. *Modern Continental Constr. Co. v. City of Lowell*, 391 Mass. 829, 465 N.E.2d 1173, 1179–80 (1984); *State ex rel. Leech v. Wright*, 622 S.W.2d 807, 815 (Tenn.1981).

16. *In re Honeywell Information Sys., Inc. Protest of Contract Award Request X–32*, 145 N.J.Super. 187, 367 A.2d 432, 439 (1976); *Johnson City v. Carnegie Realty Co.*, 166 Tenn. 655, 661, 64 S.W.2d 507, 509 (1933).

17. Tenn.Code Ann. § 12–3–203(i) empowers the Commissioner to reject all bids for a particular solicitation for the following reasons: "(1) [u]nreasonably high prices; (2) [e]rror in invitation to bid; (3) [c]essation of need; (4) [u]na-

§ 12–3–203(i)(2) authorizes the Commissioner to reject the bids if there are errors in the invitation to bid. We construe the statute to require that the errors must be material in order to justify cancelling a solicitation.

■ The Computer Shoppe does not, and indeed cannot, argue that the ITB for the sheriffs' computer system did not contain numerous material errors. The magnitude of the ITB's flaws prompted the Attorney General to advise the Commissioner of General Services that the ITB could not support the issuance of a valid contract. Therefore, the Commissioner had adequate grounds to cancel the solicitation without awarding a contract, and the Computer Shoppe had no contractual or property right in selling its computer system to the State.

In apparent recognition of the State's right to cancel the solicitation, the Computer Shoppe does not predicate its Tenn.Code Ann. § 9–8–307(a)(1)(N) claim on the State's decision to reject all the bids or even on the actual consideration of the bid. Its claim is based on the narrow ground that the State was negligent because it prepared and issued a seriously defective ITB. While we think it proper to impress the duty of fair consideration upon the State, we find no basis to impose upon the State the additional obligation to issue error-free invitations to bid.

The State's procurement statutes and procedures must be read in the light of reason and common sense. Errors occur not only in the private sector but in the public sector as well. Like contracting parties in the private sector, the State should not be held to the standard of perfection. The General Assembly has given the Commissioner of General Services the authority to cancel a solicitation when there are errors in the invitation to bid. Persons seeking to do business with the State are aware of this condition because it is part of every ITB. Thus, we do not deem it unreasonable to expect bidders to bear the risk of erroneous invitations to bid, as part of their cost of doing business with the State.

vailability of funds; (5) [a]ny other reason ap-

## IV.

■ In normal circumstances, declaratory or injunctive relief will be sufficient to protect the integrity of the competitive bidding process. However, these remedies are inadequate in circumstances such as these where the Commissioner of General Services has, with good cause, cancelled the solicitation. Thus, we conclude with a brief discussion of the proper measure of damages.

The Computer Shoppe's claim is based on the theory that it had an express contract with the State on and after September 3, 1987, obligating the State to award the contract to the Computer Shoppe, if the Computer Shoppe made certain adjustments to its software for the sheriffs' computer system. The Computer Shoppe insists that it performed by making the requested modifications and that the State breached by failing to award the contract after the modifications were completed.

The Computer Shoppe made other modifications to its software prior to September 3, 1987. Had the State's procurement in this case followed the "multi-step sealed bidding" procedure required by Tenn.Code Ann. 12–3–203(a)(1) (1987) for purchasing computers, the costs of preparing the initial bid and of the modifications made prior to September 3 would have been at the Computer Shoppe's expense. Rather than calculating the Computer Shoppe's damages, if any, based on lost profits or on the costs it incurred in submitting a bid, we find the proper measure of damages to be the costs the Computer Shoppe incurred in making the modifications requested by the State on September 3, 1987.

## V.

We find that the Computer Shoppe's complaint states a claim under Tenn.Code Ann. § 9–8–307(a)(1)(L). Therefore, we reverse the Commission's dismissal of the complaint and remand the case for further proceedings consistent with our decision.

proved by the board of standards."

The costs of the appeal are taxed to the State of Tennessee.

TODD, P.J., and FRANKS, J., concur.